Filing # 168815642 E-Filed 03/15/2023 04:58:39 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.:

ALLAN TEH, individually,

     Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation, and
THE LAKE LAW FIRM, a New York Limited
Liability Company

     Defendants.

_____/

## **COMPLAINT**

Plaintiff, ALLAN TEH ("Teh"), sues Defendants, LEE MELCHIONNI ("Melchionni"),

SYLVIA BENITO ("Benito"), PERSIST COMMUNICATIONS, INC ("Persist"), and THE

LAKE LAW FIRM, LLC ("Lake Law Firm") (collectively referred to as "Defendants") and in

support thereof alleges as follows:

## **PARTIES, JURISDICTION AND VENUE**

1.    This action is for damages, declaratory relief and equitable relief in excess

of the minimum jurisdictional limits of this Court.

2.    Plaintiff, Allan Teh, is a citizen and resident of the State of Florida. His

current residential address is located in Miami-Dade County, Florida.

3.      Defendant, Lee Melchionni, is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County Florida. His apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

4.      Defendant, Sylvia Benito, is a citizen and resident of the State of Florida. Her current residential address is located in Miami-Dade County Florida. Her apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

5.      Persist Communications, Inc. is a Florida Corporation formed in the State of Florida and doing business in the state of Florida. Persist's current office and the place of operation is located in Broward County Florida - specifically, 1815 Cordova Road, Fort Lauderdale, FL 33316.

6.      Persist's President and Registered Agent is Edward Lake ("Mr. Lake").  Mr. Lake's address as President and Registered Agent of Persist is the same principal address as Persist and The Lake Law Firm - 1815 Cordova Road, Fort Lauderdale, FL 33316. *See attached Persist Annual Report filed on January 20, 2023 as **Exhibit 1** and Lake Law invoice dated 9/1/2021 as **Exhibit 2**.*

7.      Lake Law Firm, LLC, upon information and belief, is a New York law firm with operations in the State of Florida. Lake Law firm has an office located in Broward County Florida and issues invoices regarding alleged services with the 1815 Cordova Road, Fort Lauderdale, FL 33316 office address on its invoices.  *See **Exhibit 2**.*

8.      As more fully set forth herein, Lake Law Firm has purposefully availed itself of the privilege of conducting activities within Florida and is therefore under the jurisdiction of this Court. As set out herein and pursuant to F.S. §48.193 et seq., Lake Law

Page **2** of 26

Firm is subject to specific personal jurisdiction because Lake committed multiple acts and breaches enumerated in F.S. §48.193(1) including, but not limited to: operating, conducting, engaging in, and carrying on a business or business venture in Florida, Lake Law Firm has an office in Florida, has committed a tortious act within the State of Florida and has breached and is continuing to breach agreements in Florida by failing to perform acts required by the agreements to be performed in Florida.

9.      This venue and forum are appropriate based upon F.S. § 47.011 and F.S. § 47.051 and also because virtually every act, breach and transaction set out in this Complaint occurred in Miami-Dade County Florida. To the extent other acts, breaches and transactions are stated within this complaint, those occurred in Broward County Florida. Moreover, the overwhelming majority of fact witnesses are located in Miami-Dade County, Florida.

## GENERAL ALLEGATIONS

10.     During the spring and summer of 2021, Melchionni and Benito approached Teh regarding various business opportunities involving "litigation funding" for mass tort cases.

11.     One such business opportunity was for Teh to provide capital to a limited liability company which would then invest (via loan or capital contributions) into a law firm which would then utilize the "investment" to obtain and handle various mass tort cases.

12.     Melchionni and Benito subsequently represented to Teh that there would be significant advantages if he also formed his own law firm. *See June 24th, 2021 email as Exhibit 3.*

13.     These represented advantages of Teh having his own law firm included Teh having: 1) veto power over what litigation was pursued; 2) control over dollar amounts in specific litigations; 3) the ability to add partners to "his firm"; and 4) simplified governing documents. *See **Exhibit 3**.*

14.     According to Melchionni and Benito this proposed law firm would handle different types of mass tort injury cases, including claims and lawsuits involving Hernia Mesh injuries, Talc toxicity, Round Up toxicity, and 3M Ear Plugs injuries.

15.     During that time frame, multiple meetings, conversations and emails took place wherein various specific representations were made to Teh by Melchionni and Benito regarding the viability of the proposed law firm, the cost of acquiring cases, and the number of cases that the firm would have. *See June 21st, 2021 and August 3rd, 2021 Emails as **Composite Exhibit 4**.*

16.     As set out herein, Teh has learned that these direct and specific representations were false.

17.     On June 23rd, 2021, during a conference call with the Plaintiff, and others present, Melchionni specifically claimed that there was going to be a "a fast settlement for hernia mesh" and he knew "that something is imminent".

18.     These high-pressure tactics and misrepresentations continued on various occasions.

19.     During the same June 23rd, 2021 call, and discussions shortly after, Melchionni, Benito and Teh specifically discussed the risks associated with a large capital

contribution to the yet to be formed law firm, and Melchionni and Benito represented those risks to be "none".

20.     At no point in time during these conversations did Melchionni mention the possibility of future case "drop-off" relative to the earlier representations.

21.     On or about July 20th, 2021, there were multiple follow up calls where Melchionni and Benito specifically promised Teh that upon the formation of the law firm, they would both send "monthly updates on our cases".

22.     As a result of these direct, specific and material representations made to Teh by Melchionni and Benito regarding inter alia, the number of cases that the firm would sign up as counsel and the associated costs of those cases, Teh agreed to form a law firm with Teh as 50% equity partner and Melchionni and Benito as 25% partners respectively. *See KS Law Partnership Agreement attached as* **Exhibit 5.**

23.     The name of the firm is KS Law Group LLP ("KS Law") and the Partnership Agreement (the "Agreement") was executed by Teh, Melchionni, and Benito on August 24th, 2021.

24.     Interestingly, non-party KS law had its initial place of business in Washington D.C. but changed its address to 20900 NE 30th Avenue, Miami, Florida 33180 as evidenced by multiple bank account documents dated after the signing of the earlier referenced Agreement.

25.     Relevant to this Complaint, this "updated" place of business address is the same "business" address as Melchionni (a 25% partner in KS Law) and Benito (another 25% partner in KS Law).

26. Neither Melchionni nor Benito advised their partner Teh of this address change.

27. In reliance upon the representations set out herein, Teh provided $4 million as a capital contribution for KS Law and its operations.

28. Upon information and belief, this was the only monetary capital contribution made by anyone to KS Law.

29. That $4 million capital contribution was paid by Teh via Federal Wire on Friday September 3, 2021, into the KS Law Account at Chase Bank (Acct. Ending in ***6138) at the direction of Teh's partners, Melchionni and Benito.

30. On September 16th, 2021, thirteen days after Teh's $4,000,000 was deposited into KS Law's Chase bank account, the funds were transferred and drained from that account.

31. The funds were sent to Defendant Persist's account at TD Bank, Acct ending in ***2721.

32. The effectuation and execution of that transfer was at the direction of Melchionni, Benito, Lake Law, and Persist.

33. Teh was not informed of the transfer at that time or any appropriate time thereafter.

34. It was only until the Fall of 2022, approximately one (1) year following those transfers, that Teh finally received documents obliquely referencing said transfer. To wit: a one-and-a-half-page invoice from Lake Law "to" KS Law for $3,880,000.00. *See **Exhibit 2***.

35.     Put simply, Defendants Melchionni and Benito, with absolutely no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Mr. Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

36.     Moreover, this transfer by Teh's partners was done with literally no safeguards, benchmarks or monitoring arrangements regarding the use of these funds.

37.     Critical to the allegations regarding the misrepresentations made, as stated herein, it must be noted the original, and represented purpose, of Teh's $4 million capital contribution was for working up, qualifying, processing, managing and settling cases as well as for firm marketing services, professional management services, obtaining new clients and cases, and firm infrastructure management.

38.     As shown by the transfer of the entirety of KS Law's working capital to Defendant, Persist, and the allegations set out herein, Teh's $4 million was not used for those represented purposes.

39.     Upon the formation of KS Law, the "monthly updates" promised by Melchionni and Benito never occurred.

40.     In addition, "monthly updates" are utterly insufficient and inappropriate considering the important duties of the Partners set forth herein.

41.     When updates did come, they were irregularly sent, and were accompanied with repeated representations that there was "non-material drop offs" in the number of cases of KS Law.

42. Moreover, multiple "updates" sent were simply "copy and pasted" from Google News and similar sources. Nothing in any of these "updates" remotely comports with or fulfills the Fiduciary Obligations set out herein and each of these "updates" is, in and of itself, a Breach of those duties.

43. Again, to emphasize the specificity of the fraudulent misrepresentations set out herein, the Plaintiff was specifically told by Melchionni, regarding the Hernia Mesh cases that KS Law would have, "some money may flow before the end of the year."

44. As of today's date, the Plaintiff has not been advised of a single settlement.

45. As further evidence of the breach of fiduciary duties owed directly to Teh, the Defendants, Melchionni and Benito, conspicuously and deliberately failed to keep even the most basic financial, operating, or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the profound logistics of managing hundreds of personal injury cases, Defendants, Melchionni and Bentio, have even admitted that they did not even bother to keep a general ledger for KS Law.

46. As updates from Melchionni and Benito became increasingly sparse, on October 18th, 2021, Teh and Melchionni, with others present, had a call to discuss Teh's request for specific data relating to KS Law's cases.

47. On the same date, an email was sent to Teh by Melchionni, with Benito cc'd.

48. The October 18th email claimed:

*"The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost…Hernia Mesh - We continue to march towards settlement with multiple manufacturers. We are in the process of working up our cases and replacing those that have been disqualified. We*

*are cautiously optimistic that **the majority of our docket will be settled by Q2 of 2022.***"

*See October 18th, 2021, email attached as **Exhibit 6.***

49.     Suffice to say, the majority of KS Law's "docket" was, in fact, not "settled by Q2 of 2022."

50.     As of today's date, Teh has not been advised of a single settlement.

51.     These acts, omissions and failures constitute profound and significant breaches of fiduciary duties owed directly to Teh by the Defendants Melchionni and Benito.

52.     On October 20th, 2021, Melchionni sent another email to Teh stating:

***"For Allan's law firm, KS Law Group, we spent $3,880,080.00 to acquire** 155 RoundUp cases, 200 Talc Cases, 212 Hernia Mesh Cases, and 212 3M cases. **We are entitled to 60% of the attorney fee.***"

*See October 20th, 2021 Email attached as **Exhibit 7***

53.     It is important to note that Rules 1.5(c) and 1.5(e) of Rules of Professional Conduct governing D.C. law firms explicitly state:

**1.5(c)** A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. **A contingent fee agreement shall be in writing** and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation, other expenses to be deducted from the recovery, whether such expenses are to be deducted before or after the contingent fee is calculated, and whether the client will be liable for expenses regardless of the outcome of the matter. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and if there is a recovery, showing the remittance to the client and the method of its determination.

**1.5(e)** A division of a fee between lawyers who are not in the same firm may be made only if:

(1) The division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

(2) **The client is advised, in writing**, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged;

(3) The client gives informed consent to the arrangement; ***and***

(4) The total fee is reasonable.

54. In direct breach of Rules 1.5(c) and (e) and the duties alleged herein, Defendants Melchionni and Benito never secured or obtained such agreements. Moreover, Teh has never been provided even a single written fee agreement between KS Law, co-counsel, referring counsel or any client pertaining to KS Law's involvement in the cases.

55. In addition, Melchionni stated under oath that the is not aware of any retainer agreements in which KS law is party.

56. The notion that this formerly multi-million dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein.

57. These Professional Conduct Rules are not cited to suggest an independent cause of action based upon the Rules. They are set out herein as evidence of the acts, omissions and failures that constitute profound and significant breaches of fiduciary duties owed directly to Teh by the Defendants Melchionni and Benito.

58.     On September 28th, 2022, Melchionni sent an email, cc'ing Benito, attempting to explain how the prior representations made to Teh have gone sideways.

See September 28th email as **Exhibit 8**.

59.     Melchionni writes in the September 28th email:

*"Finally, we are in the process of negotiating replacement cases for KS Law Group which will most likely be 76 Talcum Powder cases, 98 Hernia Mesh cases, 22 Roundup cases, and we can discuss 3M in person on Monday. There will be drop off in these replacement cases as well. We also have alternative options to discuss on Monday. Any case, less those cases that drop off for non-medical records reasons, will be replaced when the litigation settles, at the cost of the case plus 8% interest per year.*

*T**here is an explanation from the CEO of Persis/Lake Law Firm** below regarding the drop off in Mass Torts.*

*Reasons why mass tort cases are rejected, what phase and reasons, with specific examples using talcum powder and hernia mesh. Most of the rejection is during/after phase 2 - the retrieval phase.*
*1.     Clients are signed based on a verbal intake done, if they meet the specified criteria under the lawsuit, they are signed.*
*2.     Phase 1 - Verbal Confirmation: Reconfirm intake details verbally, add additional information specific to case type. Shortly after, secondary outreach reconfirms the information provided over the phone with the addition of details not on the intake (details on the injury, length of use, diagnosis and doctor information).*
*a.     Reasons for Rejection - unfortunately, sometimes the potential new client doesn't recall the information required to proceed (or they do not have access to medical records if it's prior 7-10 years) to the next step of the case. So, they may be disqualified at this phase. Re: hernia mesh, fall off can be because they do not have access to the records proving the initial mesh implant product ID/records necessary to prove manufacturer of mesh implanted, particularly if the original mesh was implanted over 10 years ago, most facilities purge their records after 10 years and 7 in some cases.*
*3.     Phase 2 - Retrieval Phase (medical records retrieval): Obtain medical records proving injury, diagnosis, and/or surgery where applicable.*
*a.     Reasons for Rejection - if the records are incomplete, no records found, or any issue with the records prohibiting us from moving forward with the case, they will have to be disqualified. Example re hernia mesh, if a product ID or "sticker" showing the manufacturer is not present/available, they will be disqualified (unable to prove).*

*4.     Phase 3 - Nurse Review: review of medical records by a nurse/medical professional to determine if the injury, diagnosis, and/or surgery criteria are met based on case type.*

*a.       Reasons for Rejection - if upon reviewing the records, the link is not established between the case type and injury, criteria are not met. Therefore, the potential new client is disqualified.  As an example, with hernia mesh, the defect wasn't actually a defect with the mesh, but a recurrence of the hernia due to the individual and not a mesh defect, they will be disqualified. Example using talc, many times potential new clients believe they have ovarian cancer, but it is actually uterine or another cancer not part of criteria.*

*5.     Phase 4 - PPF/PFS/Census Form: this is the document filed with the courts. It contains details involving the case including injuries, diagnosis, medical history, etc. as determined by the case type.*

*a.       Reasons for Rejection - very few will be disqualified at this phase. Mainly would be due to a client no longer wishing to pursue or unable to reach, but that will generally occur much earlier in the process.*

*A few outlier reasons for rejection:*
*1.     No will/estate, unable to file on behalf of*
*2.     Client no longer wishes to pursue*
*3.     Client is uncooperative*
*4.     Client is unresponsive/unable to reach*
*While these are reasons for rejection, there are processes in place to reduce the above. However, clients may be "rejected" due to one of the above reasons.*
*--*
*Lee Melchionni, Esq.."*

**See Exhibit 8**

60.     Even to the untrained eye, this information and risk factors should have been disclosed to Teh prior to formation of KS Law and his sizable $4 million capital contribution.

61.     Defendants' calculated failure to do so as well as their omissions set out herein clearly demonstrate the Defendants' liability for such conduct.

62.     To further comply with the requirements of specificity, and only by way of example, the September 28th, 2022, email attached a spreadsheet which demonstrated

just how significant and misleading the earlier representations made by Melchionni and Benito were. *See attached spreadsheet showing "KS Law Group – Cases Owed - % of Total Cases – Cases Allocated" as **Exhibit 9**.*

63.     Even a cursory review of the "Cases Owed vs Allocated" as set out in Column "D" demonstrate that KS Law's case "drop-offs" were now abysmal.

64.     Teh made his frustrations with Defendants' constant and repetitive misrepresentations explicitly known in an October 14th, 2022, email where he stated that "the lack of transparency and competency I have seen so far has been appalling. Constant negative surprises. To the point that I have no confidence what so ever in anything that you said." *See October 14th Email attached as **Exhibit 10**.*

65.     Despite Plaintiff's obvious and warranted frustrations Defendants' misrepresentations continued.

66.     After a long period without any update regarding the value, status, or quality of Teh's $4 million equity interest on March 3rd, 2023, Teh received a surprise . . . a conspicuously unsolicited email from Melchionni containing further worrisome representations and disclosures. *See March 3rd, 2023 email attached as **Exhibit 11**.*

67.     The March 3rd email contained spreadsheets outlining the "clients" of KS Law and their current status. ***Exhibit 12** will be submitted to the Court under seal because it contains client information.*

68.     Present on the spreadsheets were "clients" of KS Law labeling many of these "clients" as "Retained – Sent to Firm."

69. To reiterate, Teh, as a partner in KS Law, has never been provided a single retainer agreement with any "clients" of KS Law.

70. Upon information and belief, the spreadsheets provided by Melchionni were not prepared by KS Law but in fact were prepared by Lake Law Firm.

71. Attached to the March 3rd email was also a "Case Replacement Agreement" with Lake Law Firm. *See "Case Replacement Agreement" attached as **Exhibit 13.***

72. Teh was never provided notice of, or allowed input in, the execution of the Case Replacement Agreement with Lake Law Firm.

73. In addition, the Case Replacement Agreement sets forth numbers of cases and the price of acquiring said cases that materially differ from the representations made to Teh prior to the execution of the Partnership Agreement and as set out previously.

74. The Case Replacement Agreement also explicitly states and admits that Lake Law Firm "has not delivered equivalent value in cases to the Funded Amount . . ."

75. The misrepresentations that are specifically set out in this Complaint are provided to highlight and illuminate the specific nature of the fraud and breaches alleged herein.

76. Since the Complaint should contain a "short and plain statement" regarding the nature of the claims asserted, the Plaintiff cannot provide every single misrepresentation made within the body of this Complaint and reserves the right to amend and supplement this pleading as the circumstances warrant.

## COUNT 1
## <u>FRAUDULENT INDUCEMENT</u>
### (AS TO LEE MELCHIONNI AND SYLVIA BENITO)

77. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

78. As set forth herein, both Melchionni and Benito, individually and collectively made multiple false statements of a material facts, including but not limited to the number of cases in which the firm was going to be retained and how KS Law's funds were going to be used.

79. Melchionni and Benito, individually and collectively made false statements including that the funds were to be used for marketing and operations along with the misrepresentations set forth above.

80. Melchionni and Benito, individually and collectively, knew or should have known that those statements were false.

81. Melchionni and Benito, individually and collectively made these, and many other statements, to induce the plaintiff to pay the funds referenced above and enter into the Agreement.

82. As set out herein, these statements were clearly made before the execution of the Agreement.

83. These statements have proximately caused specific and direct damages to the Plaintiff when he acted in reliance on those misrepresentations. To wit: he wired $4 million of his funds to an account controlled by Melchionni and Benito, individually and

collectively, and to date has not received even $1 in the form of distribution, payment or otherwise.

84.     Regarding such direct damages, Plaintiff would not have entered into the Agreement if defendants had not made misrepresentations.

**WHEREFORE**, Plaintiff demands judgment against these Defendants for damages, pre and post judgment interest, attorneys' fees and costs, and any other relief this Court deems just and proper.

**COUNT 2**
**RESCISSION**
**(PLED IN THE ALTERNATIVE)**

85.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

86.     As set forth herein, both Melchionni and Benito, individually and collectively made multiple false statements of a material facts, including but not limited to the number of cases in which the firm had would be retained as counsel. Melchionni and Benito, individually and collectively, made additional false statements including that the funds were to be used for case management, marketing and operations.

87.     Melchionni and Benito, individually and collectively, knew or should have known that those statements were false.

88.     Melchionni and Benito, individually and collectively made these and many other statements to induce the plaintiff to enter into the Agreement.

89.     These statements were clearly made before the execution of the Agreement.

90.     These statements have proximately caused specific and direct injury to the Plaintiff, Teh, when he acted in reliance on those misrepresentations. To wit: Teh wired $4 million of his funds to an account controlled by Melchionni and Benito individually and collectively and to date has not received even $1 in the form of distribution, payment or otherwise.

91.     Rescission is an appropriately pled alternative remedy because regarding such conduct and direct damages, Teh would not have entered into the Agreement if Defendants had not made misrepresentations and rescission of the Agreement is an appropriate claim to place the parties back in their original positions.

**WHEREFORE**, Plaintiff, as rescission damages, seeks this equitable relief and demands the return of his $4 million, pre and post judgment interest, attorneys' fees and costs and all other relief that this Court deems just and proper.

## COUNT 3
### DIRECT BREACH OF CONTRACTUAL INDEMNITY
### (AS TO LEE MELCHIONNI)

92.     Plaintiff re-alleges by reference paragraphs 1 through 76 as if fully set forth herein.

93.     Paragraph 6 of the Agreement, attached as **Exhibit 5**, states, inter alia: "Melchionni…agrees to indemnify Allan Teh…from and against all…loss, cost, damage and expense … which relate to arise out of or in connection with the operation of the Partnership or a breach by the indemnifying partner (Lee Melchionni)".

94.     Prior to the filing of this complaint, Mr. Teh demanded indemnification from Melchionni.

95.     To date, Melchionni has breached his obligations and refused to comply with this indemnity provision.

96.     As a result of the acts, breaches and omissions set out herein, Allan Teh has suffered direct and individual damages because, inter alia, the contractual indemnity provisions referenced above run specifically and only to the benefit of Teh and not the Partnership or any other partner.

**WHEREFORE,** Plaintiff demands judgment against Defendant, Lee Melchionni, for damages including but not limited to the $4 million investment, lost opportunity costs, pre and post judgment interest, attorneys' fees and costs and any other relief this Court deems just and proper.

## COUNT 4
## <u>DECLARATORY ACTION REGARDING CONTRACTUAL INDEMNITY DUTIES</u>
### (AS TO LEE MELCHIONNI)

97.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

98.     Paragraph 6 of the Agreement, attached as **Exhibit 5**, states, inter alia: "Melchionni…agrees to indemnify Allan Teh…from and against all…loss, cost, damage and expense … which relate to arise out of or in connection with the operation of the Partnership or a breach by the indemnifying partner (Lee Melchionni)".

99.     Prior to the filing of this complaint, Teh demanded indemnification from Melchionni.

100.  To date, Melchionni has breached his obligations and refused to comply with this indemnity provision.

101.  There is a bona fide, actual and present, practical need for the declaration sought herein.

102.  Specifically, there is a significant controversy regarding defendant Melchionni's failure to provide indemnity as set forth in the Agreement and Teh's rights regarding that indemnity provision.

103.  The rights and interests of Melchionni and Teh are actual, present, adverse and antagonistic regarding the indemnity provision referenced herein because Melchionni has failed to comply with his duties and obligations in that regard.

104.  These antagonistic and adverse interests are all before this Court as set out in this Complaint.

105.  The relief and claims set out herein are not a request for legal advice by this Court or to seek answers to questions based on curiosity.

**WHEREFORE,** Plaintiff seeks a declaration from this Court, regarding the contractual provisions cited herein and Melchionni's duties thereupon that Melchionni shall forthwith, immediately and on a continuing basis, indemnify Plaintiff for his losses, damages and costs which include but are not limited to the $4 million investment, lost opportunity costs, pre and post judgment interest, attorneys' fees and costs and any other relief this Court deems just and proper.

## COUNT 5
## BREACH OF FIDUICARY DUTY
## (AS TO LEE MELCHIONNI AND SYLVIA BENITO)

106.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

107.    Melchionni and Benito and Teh are partners in KS Law. As such, these partners owe each other and the firm fiduciary duties.

108.    Melchionni and Benito, individually and collectively breached these duties as set forth above. Specifically, but without limitation, by Defendants Melchionni and Benito unilaterally and with absolutely no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

109.    Moreover, this transfer by Teh's partners was done with literally no safeguards, benchmarks or monitoring arrangements regarding the use of these funds.

110.    Melchionni and Benito, individually and collectively breached additional fiduciary duties by: failing to honestly and timely disclose and report the potential and actual cases in which KS Law was and has been retained as co-counsel, referring counsel, or otherwise.

111.    As further evidence of the direct breach of fiduciary duties owed to Teh, the Defendants conspicuously and deliberately failed to keep even remotely competent financial operational or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the logistics of managing hundreds of personal injury cases, Defendants have admitted that they did not even bother to keep a general ledger.

112. Teh has been directly and individually damaged in a manner distinct from any damage suffered by others.

113. Specifically, these distinct damages to Teh include, but are not limited to, the loss of his discrete and identifiable funds used to fully capitalize KS Law.

114. This is especially relevant in the context of no other Partners contributing to the firm.

115. Allan Teh has suffered direct and individual damages because, inter alia, all of the money involved in the acts and breaches sent out herein belonged to and was sent by Allan Teh and he was the only partner and investor to suffer direct financial losses as a result.

116. Teh has suffered damages which were proximately caused by the breaches set forth above.

**WHEREFORE,** Plaintiff demands judgment against Defendants, Lee Melchionni and Sylvia Benito, jointly and severally, for damages, including pre and post judgment interest, attorneys' fees and costs and any such further relief this Court deems just and proper.

## COUNT 6
## EQUITABLE ACCOUNTING
### (AS TO LEE MELCHIONNI AND SYVLIA BENITO)

117. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

118. Melchionni and Benito and Teh are partners in KS Law. As such, these partners owe each other and the firm fiduciary duties.

119. Melchionni and Benito, individually and collectively, breached their fiduciary duties by: failing to honestly and timely disclose and report the potential and actual cases in which KS Law was and has been retained as co-counsel, referring counsel, or otherwise.

120. Specifically, but without limitation, Defendants Melchionni and Benito unilaterally and with no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

121. As further evidence of the direct breach of fiduciary duties owed to Teh, the Defendants conspicuously and deliberately failed to keep even remotely competent financial operational or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the logistics of managing hundreds of personal injury cases, Defendants have admitted that they did not even bother to keep a general ledger.

122. In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

123. The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

124. Teh's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as complex transactions involving the parties hereto.

125.    Moreover, a breach of the duty imposed by those relationships is grounds for an equitable accounting.

**WHEREFORE,** Plaintiff states a remedy at law would be inadequate and demands judgment against Defendants, Lee Melchionni and Sylvia Benito, for all appropriate relief in this Claim, including damages, pre and post judgment interest, attorneys' fees and costs and any such further relief this Court deems just and proper.

## COUNT 7
## UNJUST ENRICHMENT
### (AS TO LAKE LAW FIRM AND PERSIST COMMUNICATIONS)

126.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

127.    As is clear from the allegations set out herein, the contract and events that led to the cascade of events leading to Lake Law and Persist unjustly receiving the millions of dollars, arose from acts and omissions by Lake Law and Persist and those other named Defendants.

128.    Specifically, neither Lake Law or Persist have provided anything of value to the Teh in exchange for the $4 million they received.

129.    Defendants Lake Law and Persist were individually and collectively enriched by the receipt of funds as specifically set forth herein.

130.    As referenced herein, Teh has conferred a benefit on the defendants Lake Law and Persist individually and collectively by paying such funds.

131.    Lake Law and Persist, individually and collectively, had and have knowledge of the significant benefit conferred upon each of them.

132.    The Defendants, individually and collectively, voluntarily accepted and retained the benefit conferred, i.e., the Defendants, to this day, have continued to retain those funds.

133.    As specifically set out herein, circumstances are such that it would be inequitable for the Defendants to retain the benefit conferred upon them without first providing the appropriate exchange of value and consideration to the plaintiff.

134.    Teh was legally impoverished as that term is used in the context of this claim.  Specifically, $4,000,000 of Teh's dollars was wrongfully transferred to, and is being held by, Defendants, Lake Law and Persist.

135.    As set forth herein, there was and is an obvious relationship between the above-described enrichment and impoverishment.

136.    There is no justification regarding the enrichment realized by Lake Law and Persist.

137.    There is no adequate remedy available at law regarding that which Lake Law and Persist have occasioned upon the Plaintiff.

**WHEREFORE,** Plaintiff demands judgment for all damages allowable by this Unjust Enrichment claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

## COUNT 8
## EQUITABLE ACCOUNTING
### (AS TO LAKE LAW FIRM AND PERSIST COMMUNICATIONS)

138.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

139. As is clear from the allegations set out herein, the events that led to the cascade of events leading to Lake Law and Persist unjustly receiving the subject funds arose from acts and omissions by Lake Law and Persist and those Defendants have been unjustly enriched thereby.

140. Specifically, neither Lake Law or Persist have provided anything of value to Teh in exchange for the $4 million they received.

141. Defendants Lake Law and Persist were individually and collectively enriched by the receipt of funds as alleged herein.

142. As referenced herein, Teh has conferred a benefit on the Defendants Lake Law and Persist, individually and collectively.

143. Lake Law and Persist, individually and collectively, had and have knowledge of the significant benefit conferred upon each of them.

144. The Defendants, individually and collectively, voluntarily accepted and retained the benefits conferred.

145. The Defendants, to this day, have continued to retain those funds.

146. Teh's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as the complex and significant transactions described herein.

147. According to evidence available thus far, the funds referenced herein relate to a KS Law's ability to secure and manage hundreds personal injury mass tort cases.

148. Specifically, Melchionni and Benito, unilaterally and with no authority or legitimate reason, and with Lake Law and Persist's knowledge and direction, transferred

essentially all of Teh's funds and the entire working capital of Teh's law firm to Defendants Lake law and Persist with no cognizable contract or agreement in place.

149.    In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

150.    The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

151.    Plaintiff states that a remedy at law would be inadequate.

**WHEREFORE,** Plaintiff demands judgment for all damages allowable by this Equitable Accounting claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

The Plaintiff hereby demands trial by jury on all issues and claims so triable as of right.

Dated: March 15, 2023

Respectfully submitted,

**JONES & ADAMS, P.A.**
*Attorney for Plaintiff*
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

By:

/s/ Matthew Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335
matthew@jones-adams.com